The next case is United States v. Grammons. Thank you, Chief Judge Livingston. Canon shambagam of Paul Weiss for Appellant Michael Grammons. May it please the court, over the last decade beginning with United States v. Litvak, the United States Attorney's Office for the District of Connecticut has pursued a series of prosecutions to criminalize bond traders for engaging in commonplace trading behavior. The single count of a conspiracy at issue in this appeal is all that remains of that campaign. Each of the other prosecutions ended in either a failure to convict or a reversal. And this one should as well. The government's evidence in this case is no stronger than the evidence in any of the other cases. The defense presented overwhelming evidence that counterparties knew that broker-dealers made misrepresentations about their internal profits. And the uncontroverted evidence indicated that Mr. Grammons and the other alleged co-conspirators did not act with knowledge of the unlawfulness of their conduct, and indeed sought to confirm their conduct to the law as they understood it at the time of the Litvak indictment. The deficiencies in the government's case go to three key elements of liability, materiality, conspiracy, and intent. And this court's earlier decision not to permit a new trial does not prevent the court from concluding now that the evidence was insufficient or the instructions defective on those key elements. This court can sustain Mr. Grammons' conviction only by adopting a breathtaking theory of liability that would criminalize commonplace negotiation tactics, where a party makes misrepresentations about its bargaining position in order to obtain a better deal. It would be both bizarre and inequitable to permit Mr. Grammons' conviction to stand when all the other prosecutions based on that theory have failed. Mr. Grammons' conviction should be reversed or vacated. And I'd like to start this morning with the issue of materiality. And in particular, I'd like to start with the legal standard. I just have one question. Isn't Mr. Grammons' situation different from all of these other folks who were either acquitted or whose guilt was not adjudicated in that the government's evidence of misrepresentations by him occurred after Litvak. They occurred after the compliance officials at the firm reinforced to the sales force what the expected and legally binding standards of conduct were. So he kept up his activities after they were taken off the table by the firm's regulatory. So Judge Parker, I want to speak directly to that. And I think that to the extent that the government's theory of prosecution here really depends primarily, I think, on the single post-Litvak trade. I think if anything, on balance, that weighs in our favor. And let me explain why. I think with regard to materiality, our core submission here is that even if you think that Litvak I and Litvak II established a legal standard where, under some circumstances, misrepresentations concerning a party's bargaining position can be material, we think in this case, in light of the abundant evidence, including testimony by all of the government's own witnesses, the counterparties, that they did not credit these sorts of misrepresentations, means that the government's evidence is insufficient. And certainly, this court didn't adopt a blanket rule that merely by coming in and encanting that a misrepresentation was important to a party, that that would be sufficient for all purposes and in all cases. I think that this post-Litvak trade matters potentially with regard to the question of whether or not there was the requisite shared intent for purposes of a conspiracy. And Judge Parker, let me explain why I think that works in our favor. What's a little bit odd about this case is precisely the fact that it comes to the court on a conspiracy conviction. All the other counts resulted in either an acquittal or a hung jury. And I think that the fundamental vulnerability in the government's case, and this is a case-specific argument that would lead to reversal in this case, but would leave untouched, potentially, the question of when these sorts of misrepresentations can be material, is that by the government's own recognition and under fundamental principles of conspiracy, you have to have a shared intent here. And as this court noted in its earlier opinion on the motion for a new trial, given the jury's verdict in this case, it seems obvious, not necessary, but it seems most likely that the jury's conviction here turned on that post-Litvak trade. The fundamental problem for the government is it has to find a co-conspirator for that trade who shared the requisite intent. It seems like on a, help me understand if I'm missing this, but on a sufficiency challenge, we don't divvy up the case that way. I mean, the earlier opinion was conducting a harmless error analysis. Correct. But now, we look at the evidence as a whole, and the government has the benefit of a standard that says the jury wasn't required to believe every aspect of anything that an alleged co-conspirator said during their testimony. Fair enough, Chief Judge Livingston. And we take the point that we're not making an inconsistent verdict type argument here. My point is simply that, in some sense, I think you want to start with that trade here, because that is what makes this case potentially different. And that is where the evidence of a co-conspirator with a shared intent is at its weakest, because the best that the government can do is to identify Mr. Romanelli, Mr. Grams' supervisor, and to claim that he had the shared intent by virtue of a conversation he had with Mr. Litvak, the purpose of which was apparently to conform the conduct with the law as the parties understood it. Mr. Grams' was seeking advice from Mr. Romanelli, and what Mr. Romanelli said, consistent with the advice that Nomura was providing to its traders post-Litvak indictment, was that what you should do is represent the price to you. And that is precisely what Grams' then did to Woolman. He said, this price is the best that I can get them the bonds to you. And that's at page 1194. Now, to be sure, to follow up on your point, we have the pre-Litvak trades as well. Who are the co-conspirators for those trades? Well, the government claims that the co-conspirators are the three Nomura traders, the junior traders who testified pursuant to grants of immunity in support of the government. The problem for the government there is that they all testified that they had no knowledge that their pre-Litvak conduct was unlawful. The government intimates at three points in its brief they, in fact, testified that they believed that the conduct was unlawful. I invite the court to look at the pages of the appendix that they cite and draw that judgment for itself. I think that the testimony unambiguously indicates that they did not believe that the conduct was unlawful, that they didn't even think about it at the time. And indeed, some- They said they didn't think about it in legal terms. But they also testified that it was your client that told them what to do, essentially. So the jury might have come to the conclusion that they were downplaying their culpability. But at any rate, Mr. Gramans, there was substantial evidence that he knew that what he was doing was unlawful because he was instructing others in using deceptive conduct. Enough for a conspiracy. But I don't think that that- Could you draw all inferences in favor? Of course, on a sufficiency challenge. But Chief Judge Livingston, I think that the key here is that what is required is knowledge not just of wrongfulness, but knowledge of unlawfulness. And to be clear, we are not conceding that there is even sufficient evidence of that as to Mr. Gramans. And again, I would invite the court to look at the sources to which the government points on this issue. In particular, they point to Nomura's compliance manuals and the trade licenses that the traders obtained under FINRA. I think that the most you can say about those sources is that they indicated that traders should act honestly and that traders should comply with the securities laws. Well, in some sense, that begs the question that's presented here, which is whether this conduct was, in fact, not just wrongful, but unlawful. And the biggest tell in the government's argument today is that the government does exactly what it tried to do at closing, which is to water this down to a standard of knowledge of wrongfulness. It seems like the upshot of the government's argument is, well, everyone knows that lying is wrong, and therefore, that is sufficient. But that is really the government struggling against the instructions that Judge Schotteny actually administered. And I think one of the most remarkable things about the government's brief is that when you look at page 29 of the government's brief where it cites the instructions, it leaves out the critical language on page 822 where the court defines willfulness as acting with the intent to do something that the law forbids. And so this is the most unusual situation in which I think what the government is effectively saying to this court is, look, the jury got too friendly an instruction, and you can somehow sustain the conviction on the grounds that that instruction was incorrect. And your argument is the district court got it right with regard to that instruction. The government has it wrong now, but the evidence was insufficient under that heightened instruction. Under the legally correct instruction. And to be sure, we think that there's really no doubt that that instruction was legally correct. The government primarily relies on the Kaiser case, but I think this court time and again has recited that for purposes of willfulness, the standard is knowledge of unlawfulness. And of course, we make a similar argument with regard to the good faith defense on wire fraud as well. I think the only other thing I would say, because I've gone over my time, is that with regard to intent to harm, the other argument that we make on appeal, our argument is both that the evidence was insufficient and that the omission of an instruction on intent to harm was plainly erroneous here. As to the facts, we rely on this court's cases that establish the proposition that in order to have an intent to harm, a misrepresentation must concern necessary or essential facts and go to the nature of the bargain itself. I would note parenthetically that that is the principle that the court has applied with regard to the right to control theory in addition to with regard to more conventional mail or wire fraud. So to the extent that the Supreme Court in the Simonelli case is considering the validity of that theory, we think that the outcome should be the same in both circumstances. And with regard to the instructional error, I think the only thing I would say, because my time is obviously short, is that the conclusion that the instruction here was plainly erroneous, in our view, follows a fortiori from this court's decision in the Rosso Mando case, where the court concluded that even in a circumstance where there was an instruction with regard to intent to harm, the provision of a no ultimate harm instruction, where there was no reason to provide that instruction, was plainly erroneous. Here, the jury could not have helped but conclude that an intent to harm was unnecessary. And again, on this issue, the government really took full advantage of the absence of that instruction. And the problem with the government's fundamental theory here, as with the government's legal theory on materiality, is that if this court legally accepts that theory, there is no stopping point. Any misrepresentation concerning a bargaining fact, a party's bargaining position, could give rise to federal criminal liability, particularly if knowledge of unlawfulness is not even required. At that point, lying becomes a federal crime. Can I just ask on the case that's pending before the Supreme Court on the right to control theory, you were saying that it would be prudent for this panel to think of holding this case until that case is actually argued and decided? We have not asked the court to do that. If the court ultimately concluded that there was any reason with regard to the intent to harm element to think that the analysis should be different, of course, we would have no objection to that. My client, Mr. Grammins, who's here in the courtroom, is on probation. So he is at liberty. So there would be no prejudice to him from the court doing that. We simply haven't asked the court to do that. I think that what the Supreme Court is most likely to do is to either give a thumbs up or a thumbs down on the theory of right to control more generally in that case. I don't think that, based on our assessment of the briefing, that the court is likely to opine on what this means for the intent to harm requirement specifically. I'll reserve the balance of my time. Thank you. Thank you. Good morning, Your Honors. May it please the court. My name is David Novick, Assistant US Attorney in Connecticut, and I represent the government in this matter. Your Honors, this is a sufficiency case, ultimately. There was sufficient evidence here from which a rational jury could find that Mr. Gramman's lies were material, that he acted willfully, and that he had the intent to harm his victim counterparts. The principal arguments offered on appeal by Mr. Gramman's are essentially a rehashing of the factual arguments made to the jury at trial. He was entitled to make those arguments to the jury at trial. Jury was entitled to evaluate them and reject them in favor of other evidence and other testimony in support of the government's case. However, they are not sufficient to meet. They are not enough to meet a burden here on appeal for a sufficiency challenge. The sole procedural issue raised by Mr. Gramman's involved a jury instruction that none of the more than two dozen highly sophisticated defense lawyers on behalf of the defendant and his two co-defendants objected to, I presume for strategic reasons, and at any rate sufficiently instructed the jury on the law. Unless the court prefers otherwise, I can start with materiality. It's government's view here, Your Honors, that the defense argument- Before you get to materiality, could you address your reliance on Kaiser? And if we were to agree with the appellate that there is some confusion, some muddling in our securities cases as to what the intent requirement is, and to agree with them that Cease more accurately states it, how would your sufficiency argument look then? Your Honor, there was, in this case, Judge Schotteny instructed on a standard that the defendants did not object to and seemed to agree with. And it's the government's view that on the standard that Judge Schotteny instructed, and it's different in a couple of different places. In one place, it's conscious wrongdoing, the risk of violating the law. In another case, it's doing something the law forbids. But in either of those respects, there was sufficient evidence for the jury to conclude that the defendant acted willfully. Among other things, Your Honor, there was a testimony of Jonathan Rafe, a very experienced trader who oversaw the RMBS and other desks. And he said quite clearly that this conduct was always forbidden, that that was consistent with his prior employers, consistent with pre- and post-slipback guidance from Nomura. The jury could have relied on, as Judge Schotteny did, in denying the Rule 29 motion, relied on the compliance manuals, which included reference to the federal statute, which makes explicit that you're not allowed to use deceptive conduct in securities trading. It could have relied on the federal licensing of the defendants, that Mr. Graham is here. And as there was testimony explaining that to be a FINRA-licensed trader, that one had to understand the requirements of the 34 Act. I'd also argue, Your Honors, that even if the standard is that higher threshold, that the consistent testimony as to the deceptive acts by the defendant, along with his co-conspirators, is itself evidence, is itself evidence that this scheme to consistently defraud their counterparties was quite obviously not just wrongful, but unlawful in this highly regulated securities market. And I would add, Your Honor, even considering the testimony of the three co-conspirators who, as Your Honor pointed out, explained that they didn't think of this in legal terms, that they knew that it didn't seem right, it was wrongful, even considering that the jury was entitled to give whatever weight they wanted to that testimony and to look instead, or as well, at all of those other factors that I explained. And also to understand that someone like Mr. Graham is a much more experienced trader, someone much closer in experience and education to Mr. Rafe than to his junior traders, a jury was entitled to discount the internal thinking of a non-legal thinking of these co-conspirators. And ultimately, again, this is a sufficiency case. The defendant has conceded that the jury was adequately and accurately instructed, and it was up to the jury to decide how to approach this case. Your Honor, as I will just add on that point that, with regard to the Kaiser versus Cassis standard, I do think that there is a meaningful difference in this court's jurisprudence between the standard that might apply in what we might think of as a Malum in se versus a Malum prohibitum case, that this court in Kaiser said that in a case involving a fraudulent scheme with fraudulent intent, that that does not require that higher standard of knowingly wrongful conduct under the securities laws. That it's simply knowingly wrongful conduct, and that's consistent with what the Ninth Circuit has found, as well. So I would urge the court to clarify that standard under these circumstances in deceptive conduct cases for securities fraud. Could you turn to materiality and maybe specifically address the appellate's argument with regard to Starr, which, as I understand it, is a case where, essentially, you pay the rates for high-rate mail. The defendant conceals your packages in low-rate mail, but they get there, and you got what you bargained for, which is what you paid. You paid the price that you agreed to pay, and that makes any representations immaterial. So how would you distinguish Starr? Your Honor, just as this court explained in Grammons 1, what is the critical distinction between this case and a case like Starr is the place at which Mr. Grammons and Nomore sat in the RMBS market. Their function here, for all intents and purposes, was to provide an intermediating, a brokering function between counterparties. So what they were lying about was not some sort of secret thing happening behind the scenes. They were lying about objective or their own reserve position in a particular negotiation, which is another thing we've heard from the defense. What they were lying about were objective facts in this brokering context. And the function that they were actually being paid for here, they were paid this on-tops or spread or commission, was to intermediate the bonds from one place to another. So the bargain that they were involved in involved that intermediating service. That's what they were being paid for. It's not just the bond. It's not just the intrinsics of the bond. What really mattered was the market price of the bond and what was the seller selling for, what was the buyer buying for, and facilitating negotiation between two counterparties but didn't know each other. And it was within the jury's purview here to look at the evidence here and decide that it was sufficient to meet that threshold under those circumstances, which are unique and separate and different, as this court has said, from many other circumstances, that the RMBS market is unique, has a number of different functions. I would also add that here you have testimony from a number of experienced counterparties, like Joel Wollman, like Adel Abbas, like Zach Harrison, who testified that they've got long experience. These are their expectations about what people are going to tell them in the market about when they expect to be told the truth in these broker transactions. And the jury was entitled to credit that under these circumstances. And I think that's consistent. Let me ask you this. This has been my concern all along in this case. If I am participating in this market, obviously I can't go to Bloomberg or go to the Wall Street Journal and figure out what these securities are worth. So I have my bank office do these very technical, very sophisticated analyses, tranche by tranche, default rate, prepayment rate, and so forth and so on. I can't participate in this market unless I have an understanding, for my own purposes, what this bond is worth. And so this seems to me to be removed from the normal mind of cases involving materiality because I know what the bonds are worth. And I know what the culture in this marketplace is. Unless I'm stupid, I have my antenna up when a broker I'm dealing with is telling me what the spread is. So in that context, if my understanding of these procedures is right, I'm not entirely clear about why a statement that I have 24 ticks and can't give you 40 matters. Certainly. Obviously they'll say it matters when they're sitting in the US Attorney's office or you have them on the stand because they'll get fired if they don't. Your Honor, the answer to that relates to the context under which these transactions are occurring. So yes, the individual investors testified here. Mr. Wallman, Mr. Marks, Mr. Harrison, Mr. Voss testified that they have these complicated models. And there was extensive testimony about the models. But the models aren't relevant to the market. They are only tangentially relevant, I should say, to the market price of the bond. What actually happens is the model tells them at a particular price. You didn't say the only tangentially. I didn't follow that. Sure, because what the model does is it puts in a price that I might pay for it and spits out a yield. That's what Joe Wallman explained. That's what Mr. Voss explained. So all it tells you is, if I buy this at a particular price, how much am I going to make in the long term from owning that bond? It doesn't. And then I know from my, if I'm an investor, I know how much yield I'm looking for out of this particular investment. And so then I got to go to the market and find out how much can I actually buy this bond for. And what the witnesses testified to at that point, they explicitly said, at that point, the models don't matter. At that point, they have a price range at which they're willing to transact because it fits the investment profile. And at that point, they are at the mercy of Mr. Gramans and Nomura to go and intermediate a trade. And they don't know how much, let's say, if they're buying, they don't know how much a seller might be offering that bond for any given time. Now, they may have color from other trades. They may have a general sense. But on that particular day, at that particular time, what the testimony was is that the only way that they could transact that bond was to go and work through Nomura or another broker-dealer. And as far as the culture goes, Your Honor, the testimony was that in the context from all of these witnesses, notwithstanding the arguments from the defendant and notwithstanding concessions from these witnesses, that in other circumstances, they may have their antenna up a little bit more outside of these broker transactions, outside of the actual transactions themselves. But then in those circumstances, they did rely in part or in whole on the information that Mr. Gramman's or other Nomura traders were providing them. And at any rate, the jury under these circumstances was entitled to sufficiency case, was entitled to credit that testimony. It was entitled to find that it was material to the ordinary investor or to the ordinary hedge fund. I see my time is well up.  Rely on my brief. Thank you, Your Honor. My friend, Mr. Novick, repeatedly encants that this is a sufficiency case as if that provides the government with a blank check. But if there's one thing that's clear, this is no ordinary sufficiency case. And I want to address the sufficiency of the evidence in my two minutes, both with regard to materiality and with regard to the requisite intent for a conspiracy. On the issue of materiality, the legal standard is whether a reasonable investor would find the misrepresentation important in making a decision to invest at the agreed upon price. And the key here is, in what respect is the misrepresentation important? When you look at the testimony of the counterparties, in the main, it is testimony that the misrepresentations were important in the sense that if the counterparties had known of Nomura's true profit margin, they would have negotiated differently. But the legal standard turns on whether or not they would have invested at that price. And the only evidence to which the government can point is the single statement of Joel Wallman, a bald assertion that he would not have purchased the bonds at the final price if he had known about Nomura's profit margin. But the problem for the government is that, as this court indicated in Lit Vact II, it's not enough to simply have the testimony of one trader in the market. You have to have evidence of a nexus between that particular trader's viewpoint and that of the mainstream thinking of investors in that market. And all of the evidence here indicated that counterparties did not attach weight to these misrepresentations, and indeed that they often purchased bonds without any knowledge of the profit margin at all. And even with regard to Wallman, if you take a look at page 708 of the appendix, he ultimately conceded that the trade at this price was in his client's best interest, which Judge Parker goes to this point about how this market works. What makes this different from an ordinary retail market is that, in these cases, the counterparties are sophisticated, trading at arm's length, have their own complex valuation models, and all testify that the bid or offer price from the counterparty was not relevant to their valuation. And Nomura, of course, could always decide not to trade at a particular price to hold bonds in inventory. Indeed, with the post-Litvak trade, there was some evidence in the chat with Romanelli that that was precisely what Mr. Gramans would have done if Mr. Wallman was not willing to trade at the agreed-upon price. And finally, with regard to the existence of a conspiracy and the shared intent, again, there's no dispute, regardless of the formulation of the intent, that you have to have a co-conspirator, as you do in any conspiracy case, that shares the intent to commit the underlying crime. We heard nothing from my friend Mr. Novak about Mr. Romanelli. And I think that that's for good reason. Merely being present in a group chat is not ordinarily thought of as sufficient evidence to have shared intent. And so that really takes the post-Litvak trade off the table. Now, my friend Mr. Novak talks about the three Nomura traders. And he says that the jury was free not to credit their testimony. Of course, that's always true. But in a sufficiency challenge, the government has to point to at least some affirmative evidence of the requisite intent. And that evidence, I would submit, is simply absent here. We heard from Mr. Novak really, for the first time, focusing primarily on this testimony of another Nomura witness, Mr. Rafe. But he essentially just testified as to his view as to what the law is. And that's not sufficient. And to the extent that he referred to Nomura's policies, you have to have some evidence of what those policies actually were. And again, I would urge this court to look at the compliance manuals. The mere fact that the compliance manual said that you should adhere to the securities laws is not exactly powerful evidence of knowledge of unlawfulness, particularly in this context, where the Litvak indictment was front page headline news, and where everyone agrees that that really came as a shock to the industry. And so I would respectfully submit in closing to this court that there is no way to treat this case differently from the other cases, simply because it involved a post-Litvak trade. And there's no way to uphold the conviction in this case without accepting one of the government's efforts to water down the legal standards here, whether it's to water down the legal standard for materiality so that mere bargaining facts can be material, which as we point out in footnote one, would create a conflict with the Seventh Circuit, and would also upend the ordinary understanding of how fraud operates. It would render any representation by a car salesman fraud, or by watering down the requirement for state of mind for these offenses, so that mere knowledge of wrongfulness. And again, that's essentially testimony that lying is wrong, that George Washington, when he chopped down the cherry tree, was somehow committing fraud. Without doing one of those two things, we would respectfully submit this court cannot uphold this conviction. And again, it would be the height of inequity for the court to do that in a circumstance in which all of the other traders whom this United States Attorney's prosecuted are free from criminal liability. Thank you. Thank you both, and we'll take the matter under advisement. Well argued.